## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS

BELINDA SMITH,            )
                            )
     Plaintiff,         )
                            )
       v.            )    No.  16CV7441
                            )
THE UNIVERSITY OF CHICAGO   )    Judge Aspen
MEDICAL CENTER,[1]         )
                            )
     Defendant.     )
                            )

## DEFENDANT'S LOCAL RULE 56.1(a)(3) STATEMENT OF MATERIAL FACTS IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT

Defendant, The University of Chicago Medical Center ("UCMC"), pursuant to Rule 56.1(a)(3) of the Local Rules of the United States District Court for the Northern District of Illinois, in support of its Motion for Summary Judgment, hereby submits the following Statement of Material Facts to which it contends there is no genuine issue and which entitles it to judgment as a matter of law.

### Jurisdiction and Venue

1.      Jurisdiction is invoked pursuant to 28 U.S.C. §1331 and §1343, as the claims arise under the laws of the United States. [Dkt. 1, Complaint ("Compl."), ¶ 11]. Venue is proper in this matter as the alleged events giving rise to Plaintiff's Complaint occurred within the Northern District of Illinois. [Compl. ¶ 4].

### Identification of the Parties

2.      The University of Chicago Medical Center ("UCMC") is a not-for-profit, academic medical center located in Chicago, Illinois.[2] [Exhibit 3, Bailey Decl. ¶ 4].

---

[1]   The Defendant was improperly named in the Complaint as "University of Chicago Medical Centers Food Service." There is no such entity. The proper Defendant is The University of Chicago Medical Center.

3. Plaintiff Belinda Smith ("Plaintiff") was employed at UCMC from February 2005 to June 2015. [Exhibit 3, Bailey Decl. ¶ 13]. Her date of birth is October 27, 1982. [Exhibit 1, Smith Dep. p. 49].

### Plaintiff Worked in the Food Services Department at UCMC

4. UCMC contracts with an outside provider to manage food services operations at its hospital facilities. [Exhibit 1, Smith Dep. p. 35; Exhibit 3, Bailey Decl. ¶ 14]. Prior to April 2014, food service operations at UCMC were managed by Sodexho USA ("Sodexho"). [Exhibit 1, Smith Dep. p. 162; Exhibit 3, Bailey Decl. ¶ 14]. Since April 2014, Aramark Healthcare Hospitality ("Aramark") has managed food services at UCMC. *Id.*

5. Plaintiff was a Food Service Worker for the entire duration of her employment. [Exhibit 1, Smith Dep. p. 119]. She was employed by UCMC, but her managers were employed with either Sodexho or Aramark. [Exhibit 1, Smith Dep. pp. 121-122].

6. As a Food Service Worker, Plaintiff performed various job functions related to food service at UCMC including, but not limited to, preparing food items, stocking food items, delivering food trays to patient rooms, collecting and cleaning food trays, and sweeping and mopping. [Exhibit 1, Smith Dep. pp. 120; Exhibit 2, Smith Dep. Ex. 15].

7. Plaintiff was a member of the Teamsters Local Union 743 during her employment at UCMC. [Exhibit 1, Smith Dep. p. 124].

8. From April 2014 to June 2015, Plaintiff reported to Calandria Goshay ("Goshay"), Patient Services Manager. Ms. Goshay reported to Marilyn Walls ("Walls"),

---

[2] The following abbreviations will be used in citations throughout: Belinda Smith Deposition (Smith Dep. ____) (Exhibit 1); Smith Deposition Exhibits (Smith Dep. Ex. ____) (Exhibit 2); Mario Bailey Declaration (Bailey Decl. ____) (Exhibit 3); Marilyn Walls Declaration (Walls Decl. ____) (Exhibit 4); Calandria Goshay Declaration (Goshay Decl. ____) (Exhibit 5).

QB\51866660.1

Director of the Food Services Department. Both Goshay and Walls worked for Aramark. [Exhibit 1, Smith Dep. pp. 121-122; Exhibit 4, Walls Decl. ¶¶ 4-5; Exhibit 5, Goshay Decl. ¶ 4].

### Plaintiff Took a Leave of Absence in 2012

9. In early 2012, Plaintiff sought treatment at UCMC for symptoms she described as whiplash, and sciatic and muscular problems which made walking difficult. [Exhibit 1, Smith Dep. pp. 95-96]. Following several visits to the emergency room and to her primary care physician where no condition could be found or verified, Plaintiff was referred to another hospital for psychiatric evaluation. [Exhibit 1, Smith Dep. p. 101].

10. Plaintiff took a leave of absence from her Food Service Worker job at UCMC from April 2012 to November 2012. [Exhibit 1, Smith Dep. pp. 32-33]. Plaintiff testified that she does not know who took her off work in April 2012 or who returned her to work in November 2012. [Exhibit 1, Smith Dep. pp. 34, 106].

11. In her Complaint, filed on July 21, 2016, Plaintiff asserted that she was discriminated against beginning on or about April 26, 2012, the date she went out on leave. [Compl. ¶ 6].

### Plaintiff Had Severe Performance Problems at Work

12. On February 8, 2013, Plaintiff was issued a "Documented Verbal Warning" from her supervisor at Sodexho for "unsatisfactory work performance" and "performing job assignment grossly inconsistent with outlines (sic) job duties and responsibilities":

> 1. Time management: Time to perform core functions of position are below department standards such as:
>
> ◦ On January 28 2013, was observed scrapping 6 dirty trays, which took approximately 25 mins
> ◦ takes 45 min + to collect dirty trays from Comer floors
> ◦ efficiency in completing job requirements, such as stocking hot and cold areas

QB\51866660.1

2. Communication:

- lack of communication . . . to complete the duties efficiently.

3. Attitude:

- has exhibited poor attitude towards peers
- when asked to do a particular task that deviates from own personal routine, she exhibits poor attitude towards manager on duty which includes rolling eyes, mumbling underneath her breath and had various gestures
- Consistently question assignments/tasks given by management such as on Tuesday 2-5-2013 when asked to strip carts instead of collect dirty trays. She spent approximately 20 mins discussing with manager on duty how that task will put her behind.

[Exhibit 2, Smith Dep. Ex. 16; Exhibit 3, Bailey Decl. ¶ 15 and Bailey Exhibit E].

13. On November 14, 2013, Plaintiff was issued a written warning for "unsatisfactory work performance":

> . . . on 11-14-13 Belinda work position #261 … poor work peformance during the time of 6:30 and 9am Belinda retreaved 4 carts from units. in this time frame #261 is required to bring down carts deliver dylassis, set up soak bins, work the dish machine theese task were not completed. belind work is not completed in time frame allotted. continued infractions will progress corrective action up to and including termination.
>
> * * *
>
> We met with Belinda and had union rep, Devina, present as well. We discussed concerns about Belinda's job performance identifying key issues such as the speed at which she works ( and not completing 2 soiled cart change outs per shift), and also pushing the cart ahead of her and slowing sauntering up to it, only to push it again. Richard did note that this was the second time that she was spoken to about this behavior. I did discuss that I have reviewed the job flows and made adjustments to even the workout between both positions . . . It should be noted that Belinda did not take responsibility for her behavior and did continue to point out what others are doing wrong . . . We closed the meeting and asked Belinda that for the time being she not worry about what others do, make sure she works fast enough to get to her carts twice a day so nothing is left over until the following shift and in

turn the next day and to also hold onto the cart the entire time that she is moving the cart.

[Exhibit 1, Smith Dep. 171; Exhibit 2, Smith Dep. Ex. 17; Exhibit 3, Bailey Decl. ¶ 16 and Bailey Exhibit F]. Plaintiff testified that after she received this written warning she understood that the next time she received discipline it would be greater than a written warning. [Exhibit 1, Smith Dep. p. 171].

14. On April 9, 2014, Plaintiff received another written warning from Sodexho management for "unsatisfactory work performance" and "failure to comply with Pride Values/Care Standards/Workplace Civility Policies":

On 4/8/2014 @ approx 2:15pm the dishroom work station that you were working was found in the condition of the attached photo. You were trained and directed not to leave the station in that condition. You refuse to follow directions and state "that you would do the work the way you wanted and it was not up to Managers to show you how to do your job". You are unable to complete the work assigned in the job flow within the time required. Your work was left incomplete and had to be finished by two Managers-Mr. Karl Betts and Mr. Terry Bomkamp.

On 4/9/2014 at 6:45 am you were retrained by Manager, Mr. Terry Bomkamp on how to complete the work assigned to you in the job flow. Your dishroom work station was found in an unacceptable condition and not in accordance to the most recent training completed on 4/8/2014. See attached photo's taken approximately 10:15am. Training had been done with you several times in the last 2 weeks by Mr. Karl Betts, Manager. Mr. Terry Bomkamp, Manager, had cleared the dirty dishes that accumulated and put the work station back in correct order. He then attempted to retrain you @ 11:20am with the assistance of Mr. Rodney Smith, Manager and Ms. Sandra Jackson, Manager. You refused to listen, walked away several times, raised your voice to a level of shouting. You further stated that you were not going to follow the training and directions given. You were then advised to take your break and return to work at the assigned time and follow the training outlined by Mr. Terry Bomkamp, Mr. Rodney Smith and Ms. Sandra Jackson.

[Exhibit 2, Smith Dep. Ex. 18; Exhibit 3, Bailey Decl. ¶ 17 and Bailey Exhibit G].

5

15.    Plaintiff was suspended by management for unsatisfactory work performance for one week in April 2014.  [Exhibit 1, Smith Dep. p. 182; Exhibit 3, Bailey Decl. ¶ 18].  Plaintiff did not grieve her suspension.  [Exhibit 1, Smith Dep. p. 182].

16.    On June 13, 2014, Aramark management (who had taken over Food Management from Sodexho) met with Smith to address her work performance.  Aramark management expressed their concerns regarding Smith's performance, including the speed in which she worked and completed her work tasks.  During the meeting, Smith was disruptive and argumentative, and would not allow her manager to speak about her performance.  After she interrupted others in the meeting several times, she was asked to allow others to speak.  She continued to interrupt and argue.  Her conduct in the meeting violated UCMC's Service Pride and Civility policies.  [Exhibit 4, Walls Decl. ¶ 6].

17.    On July 30, 2014, Plaintiff received a Final Written Warning from Director Marilyn Walls at Aramark for "Unsatisfactory Work Performance" and "Failure to Comply with Pride Values/Core Standards/Workplace Civility Policies":

> Belinda is being issued a Final Written Warning for unsatisfactory work performance and violating the· Medical Center's Service Pride and Civility policies.
>
> On June 27, 2014, Belinda failed to perform her assigned job duties for the day.  Her failure to complete her assigned duties has impacted not only the operation of the department but also the patient experience. Belinda was assigned to wash dishes to ensure they are ready for the patient line.  Belinda failed to complete her assigned duties.
>
> On June 19, 2014, Belinda was assigned to have all the 2nd, 3rd and 4th floors completed.  Belinda was to have the soiled carts changed out as required.  When asked if she had completed her assigned tasks, Belinda responded no.  Belinda's failure to complete her assigned duties has impacted the operation of the department and also the patient experience.

6

> On June 17th, Belinda was assigned to have all the carts of her assigned floors stripped that day. Belinda failed to complete her assigned tasks impacting the operations and patient experience.
>
> On June 13th, Management met with Belinda to address her work performance. Management expressed to Belinda their concerns regarding her job performance; identifying key issues such as the speed in which she works and completing her assigned tasks. During this meeting, Belinda's conduct was in violation of the Medical Center's Service Pride and Civility policies.
>
> Previously, Belinda has received a Verbal Warning, Written Warning and Suspended for unsatisfactory work performance. Belinda's continued failed to perform her assigned job duties satisfactorily will result in further corrective action up to and including termination of her employment.

[Exhibit 1, Smith Dep. pp. 177-178; Exhibit 2, Smith Dep. Ex. 19; Exhibit 4, Walls Decl. ¶ 7 and Walls Exhibit A]. Plaintiff testified that when she received this Final Written Warning she understood that any future failure to perform could lead to her termination. [Exhibit 1, Smith Dep. p. 180].

18.     Plaintiff testified that she has no information or evidence that Director Walls did not believe what she wrote in the July 30, 2014 Final Warning. [Exhibit 1, Smith Dep. p. 183].

**Plaintiff Had a Baby in 2014, But Never Gained Custody of the Child**

19.     Plaintiff gave birth to a daughter (Jaliya) on September 18, 2014. [Exhibit 1, Smith Dep. p. 36]. Plaintiff testified that the Illinois Department of Children and Family Services ("DCFS") would not allow her to take custody of her daughter. *Id.* at p. 87. Plaintiff later lost parental rights regarding her daughter. *Id.* at 145.

20.     When asked if this lawsuit was about her employment at UCMC or issues regarding custody of her daughter, Plaintiff testified:

> Q.     Is that what this lawsuit is about?
> A.     (Smith) It's all about my children, my child. I don't care about the employment. It has nothing to do with it. I don't care. It's about my daughter.

Q.      . . . Are you saying you're not making claims related to your employment?

A.      Well, yeah, yes, yes, but it's all -- it's about Jaliya Yvonne Smith.  It's what --- yes, it's about her.

Q.      That is your main issue?

* * *

A.      Yes.

[Exhibit 1, Smith Dep. p. 87].

21.     Plaintiff returned to work following the birth of her daughter on November 3, 2014.  [Exhibit 1, Smith Dep. p. 159].

**Plaintiff's Performance Worsened After She Returned to Work**

22.     Shortly after her return to work, Plaintiff initiated several confrontations with co-workers and supervisors while at work.  [Exhibit 2, Smith Dep. Ex. 20].  Plaintiff testified that she argued with Supervisor Calandria Goshay and several of her co-workers on several occasions.  [Exhibit 1, Smith Dep. p. 194].

23.     For example, on January 17, 2015, Plaintiff stopped her co-workers in the kitchen to check on the meal tickets and the meal boxes because she said that her co-workers were making mistakes and that they were asking her to make things that weren't on the patients' meal tickets.  When Goshay explained to Plaintiff that that was not her responsibility, Plaintiff began yelling at Goshay stating that everyone was conspiring against her and that Goshay wanted to get her fired.  [Exhibit 2, Smith Dep. Ex. 20; Exhibit 4, Walls Decl. ¶ 9; Exhibit 5, Goshay Decl. ¶ 7].

24.     On January 18, 2015, Plaintiff snatched a mop out of a co-worker's hand as she attempted to clean up a spill.  [Exhibit 1, Smith Dep. p. 188].  Plaintiff also stopped a co-worker on her way to deliver a cart so Plaintiff could reheat soup because Plaintiff said that they didn't do it the right way the first time.  [Exhibit 1, Smith Dep. p. 197; Exhibit 2, Smith Dep. Ex. 20; Exhibit 4, Walls Decl. ¶ 10].

8

25. Plaintiff also refused to follow directions. For example, on January 30, 2015, Plaintiff was informed that she must tell her manager before she goes out on break. Plaintiff argued with Goshay telling her that she shouldn't be expected to remember things like that and that Goshay was conspiring against her. [Exhibit 2, Smith Dep. Ex. 20; Exhibit 4, Walls Decl. ¶ 11; Exhibit 5, Goshay Decl. ¶ 9].

26. On February 4, 2015, Plaintiff was hostile towards Goshay and claimed that everyone in the kitchen was out to get her. After several attempts to calm her down, and after she was warned that she would be asked to leave the kitchen if she didn't lower her voice and calm down, Plaintiff continued to yell at Goshay. Plaintiff was escorted out of the kitchen. [Exhibit 2, Smith Dep. Ex. 20; Exhibit 4, Walls Decl. ¶ 12; Exhibit 5, Goshay Decl. ¶ 10].

27. Plaintiff was suspended in February 2015 for hostile behavior in the workplace following her outburst on February 4, 2015. [Exhibit 4, Walls Decl. ¶ 13].

28. On March 20, 2015, Plaintiff was issued a second Final Written Warning by Walls for "Unsatisfactory Work Performance" and "Failure to Comply With Pride Values/Care Standards/Workplace Civility Policies" following her poor performance over the preceding month:

> Belinda is being issued a Final Written Warning for the following violations:
>
> - Unsatisfactory Work Performance
> - Employee Termination Policy (HR 212); inconsiderate or inappropriate treatment of co-employees and performing job assignments grossly inconsistent with outlined job duties and responsibilities, or Medical Center policies and procedures.
> - Workplace Civility (HR 1012); Workplace behavior is behavior that creates an atmosphere and environment that enhances and promotes respect for the integrity, dignity and worth of each and every human being.
> - Service Pride (HR 601)

9

> Previously, Belinda received a final written warning on July 30, 2014 for unsatisfactory work performance.
>
> * * *
>
> Going forward Belinda is expected to perform her assigned job duties and responsibilities effectively. In addition, Belinda's behavior is to be consistent with the expectations of the Medical Center policies. Failure to do so will result in further corrective action up to and including termination of her employment.

[Exhibit 2, Smith Dep. Ex. 20; Exhibit 4, Walls Decl. ¶ 14 and Walls Exhibit B]. Plaintiff testified that when she received the Final Written Warning she understood that any future failures to perform could lead to her termination. [Exhibit 1, Smith Dep. p. 192].

29. Plaintiff also testified that she had no information or evidence that her supervisors, Walls and Goshay, did not believe what had been written in the March 2015 Final Written Warning. [Exhibit 1, Smith Dep. pp. 190-191].

30. On April 11, 2015, Plaintiff told Goshay that "God was going to get you." Goshay reported the statement, and concerns for her own safety, to Walls and Jen Whepley, Aramark Human Resources Representative. Plaintiff was counseled by Whepley, Walls and Goshay about use of threatening language on April 15, 2015. [Exhibit 4, Walls Decl. ¶ 15; Exhibit 5, Goshay Decl. ¶ 12].

31. On June 1, 2015, Plaintiff told her co-workers at work "I will fight people in here today," after she received final instructions for completing duties on her shift. [Exhibit 1, Smith Dep. p. 199; Exhibit 4, Walls Decl. ¶ 16].

32. After this was reported to management, Plaintiff was suspended on June 5, 2015. [Exhibit 1, Smith Dep. p. 203; Exhibit 4, Walls Decl. ¶ 17].

10

33. After a review of Plaintiff's disciplinary history, and recent incidents of poor performance and aggression towards co-workers and management, Plaintiff was terminated effective June 5, 2015. The termination letter stated, in part:

> This letter serves as written notice that your employment as a Food Service Worker with the University of Chicago Medical Center ("UCMC") is being terminated effective June 5, 2015 for violation of UCMC policies:
>
> 1. HR212 - Termination
>    - Engaging or participating in physical violence, and/or the threat of physical violence or other inappropriate conduct against any person or property;
>
> 2. HR614 - Workplace Aggression
>    - Non-Physical Assault, defined as verbal or non-verbal threats, gestures, offensive or intimidating comments, made by one or more persons toward another person or persons, which would lead a reasonable person to believe that he/she is in danger of personal harm or fear for their safety or the safety of their personal possessions, property or other persons.
>
> 3. Workplace Civility- HR1012
>    - Respecting Fellow Employees
>
> 4. UCMC Standards of Behaviors
>    - Use respectful, professional language at all times
>    - Be mindful of my body language, actions, and tone
>    - Resolve conflicts in private and talk to the person with whom l have an issue
>
> The above violations, together or separately, are considered serious enough such that a single violation may warrant termination of employment.

[Exhibit 2, Smith Dep. Ex. 21; Exhibit 4, Walls Decl. ¶ 18 and Walls Exhibit C].

34. Walls made the decision to recommend Plaintiff's termination to UCMC. Her recommendation was reviewed and approved by Aramark Executive Director Mary Pat Severns and Aramark Human Resources Representative Jen Whepley. [Exhibit 4, Walls Decl. ¶ 18].

11

35.     UCMC decided to terminate Plaintiff based on Plaintiff's violation of several UCMC policies, including its policy on Workplace Civility, Workplace Aggression Policy, and Employee Termination Policy.  [Exhibit 2, Smith Dep. Ex. 21; Exhibit 3, Bailey Decl. ¶ 22].

36.     A meeting was set up between UCMC, Plaintiff and her union to discuss her termination and a potential grievance regarding her termination, but Plaintiff chose not to attend the meeting so she could visit her daughter.  [Exhibit 1, Smith Dep. pp. 130-131, 208].  She made no effort with the union to reschedule the grievance meeting.  [*Id.* at p. 208].

**Plaintiff's Charge of Discrimination**

37.     With the assistance of counsel, Plaintiff filed a Charge of Discrimination ("Charge") with the Equal Employment Opportunity Commission on August 12, 2015.  [Exhibit 1, Smith Dep. pp. 20-21].   In the Charge, Plaintiff only checked off the box for "disability" discrimination.  [Exhibit 1, Smith Dep. pp. 22-23; Exhibit 2, Smith Dep. Ex. 1].

38.     In the Charge, Plaintiff does not identify her purported disability.  [Exhibit 2, Smith Dep. Ex. 1].

**Plaintiff's Disability Allegations**

39.     Upon receipt of a Notice of Right to Sue from the EEOC, Plaintiff filed a *pro se* complaint alleging disability discrimination based on her termination, failure to promote, failure to stop harassment, and "retaliation due to personal medical relation."  She also claimed she "was terminated to support the University of Chicago Medical Center's doctors' misdiagnosis.  The diagnosis had caused me to lose custody of my child Jaliya."  [Exhibit 1, Smith Dep. pp. 29-31; Exhibit 2, Smith Dep. Ex. 3].

40.     In the Complaint and in her Amended Complaint, Plaintiff does not identify her purported disability.  [Complaint ¶¶ 1-16; Dkt. 6, Am. Complaint ¶¶ 1-16].

12

41.     Plaintiff testified that she did not believe she was disabled.  At deposition, Plaintiff testified "I would never claim that I'm disabled, no."  [Exhibit 1, Smith Dep. p. 90].

42.     Plaintiff also testified she did not have a disability in 2014 or 2015.  [Exhibit 1, Smith Dep. p. 92].

43.     Plaintiff was not taking any kind of medication in 2014 or 2015 while still employed at UCMC.  [Exhibit 1, Smith Dep. p. 12].

44.     Other than taking off six weeks after the birth of her child in late 2014, Plaintiff took no time off in 2014 or 2015 for medical or health-related reasons.  [Exhibit 1, Smith Dep. pp. 159-160].

45.     Plaintiff testified she lived independently in 2014 and 2015.  She took care of herself, cooked and cleaned for herself, went to the grocery store, walked to work, worked, and paid her own bills in 2014-2015.  She testified there were no limitations on the work she could do.  [Exhibit 1, Smith Dep. pp. 92-94].

46.     Plaintiff did not inform anyone at UCMC that she was disabled or had a disability, including, but not limited to her supervisors Walls and Goshay, the UCMC Human Resources Department or the UCMC Compliance phone line.   [Exhibit 1, Smith Dep. pp. 211-212].

47.     Plaintiff never sought any type of accommodation or job modification at UCMC. [Exhibit 1, Smith Dep. p. 212].

48.     Plaintiff never sought FMLA leave during her employment at UCMC.  [Exhibit 1, Smith Dep. p. 214].

13

49. Plaintiff testified that neither Marilyn Walls nor Calandria Goshay ever said anything to her that she believed was discriminatory based on any disability. [Exhibit 1, Smith Dep. p. 216].

50. Plaintiff testified that she does not believe Walls or Goshay took any action against her based on a disability. [Exhibit 1, Smith Dep. p. 230].

51. Plaintiff testified that she has no evidence Walls or Goshay took any action against her based on a disability. [Exhibit 1, Smith Dep. p. 232].

52. Neither Walls nor Goshay considered Plaintiff to be disabled. [Exhibit 4, Walls Decl. ¶ 21; Exhibit 5, Goshay Decl. ¶ 17].

53. Plaintiff testified that she has no information or evidence that Goshay or Walls considered her to be disabled, or that Goshay or Walls had any information about any diagnoses Plaintiff ever received. [Exhibit 1, Smith Dep. p. 232].

54. Plaintiff testified that she overheard a Sodexho supervisor named Nadine say, in November 2012, "there's something weird" about Plaintiff. [Exhibit 1, Smith Dep. p. 217-218]. Plaintiff also testified that Nadine did not take any action Plaintiff that Plaintiff believed was discriminatory. [*Id.* at pp. 218-219].

55. Plaintiff testified that she overheard Sodexho supervisor Amy Grzyb tell other supervisors in November 2012, "let me know if there is any abnormal behavior." [Exhibit 1, Smith Dep. pp. 219-220]. Plaintiff also testified that Grzyb did not take any action against Plaintiff that Plaintiff believed was discriminatory. [*Id.* at 220]. Grzyb left Sodexho before Aramark took over for Sodexho in 2014. [Exhibit 1, Smith Dep. at p. 221].

56. Plaintiff testified that a Sodexho supervisor named Byron joked with her in 2013 "you better not have any children" or something like that. [Exhibit 1, Smith Dep. pp. 90-91,

14

QB\51866660.1

220-221]. Plaintiff testified that Byron did not take any action against Plaintiff that Plaintiff believed was discriminatory. *Id.* at pp. 221-222. Byron left UCMC when Aramark took over for Sodexho in 2014. [Exhibit Smith Dep. p. 221].

57.     Plaintiff has not identified any statement that she thought was discriminatory, or that related to any disability, that was made by any of her supervisors at Aramark, or that was made in relation to any discipline she received over the last several years of her employment. [Exhibit 1, Smith Dep. p. 222].

58.     Plaintiff did not complain to UCMC's compliance phone line about discrimination or harassment. [Exhibit 1, Smith Dep. p. 113].

59.     Plaintiff has no recollection as to whether she ever went to UCMC Human Resources to talk about discrimination or harassment. [Exhibit 1, Smith Dep. pp. 115-116].

60.     Plaintiff has not identified any other employee who was insubordinate or argumentative like Plaintiff, but was not disciplined like Plaintiff. [Exhibit 1, Smith Dep. p. 271]. Plaintiff testified she did not know if any other workers in the Food Services Department were treated differently from Plaintiff because they did not have a disability or because they were not considered disabled. [Exhibit 1, Smith Dep. p. 272].

61.     Plaintiff did not apply for disability benefits from the Social Security Administration at any time during or after her employment at UCMC. [Exhibit 1, Smith Dep. p. 48].

62.     Plaintiff testified she had no information or evidence that Walls or Goshay or any other member of management ever retaliated against her in 2014 or 2015. [Exhibit 1, Smith Dep. pp. 272-273].

63. Plaintiff asserts she was not promoted from a Grade 7 Food Service Worker to a Grade 8 Service Worker in 2007. [Exhibit 1, Smith Dep. 244]. Plaintiff makes no other claim that she was denied a promotion because of a disability. [Exhibit 1, Smith Dep. p. 246].

64. Plaintiff testified that she has no information or evidence that Walls or Goshay had any information about any diagnosis she received from any UCMC doctor. [Exhibit 1, Smith Dep. p. 252]. Neither Walls nor Goshay had any information about any diagnosis Plaintiff received from any doctor. [Exhibit 4, Walls Decl. ¶ 23; Exhibit 5, Goshay Decl. ¶ 19].

65. Plaintiff's supervisors in the Food Services Department were unaware of any legal issues Plaintiff was experiencing related to child custody. [Exhibit 4, Walls Decl. ¶ 24; Exhibit 5, Goshay Decl. ¶ 20].

66. Plaintiff testified she has no evidence that any of her managers at UCMC had any involvement in any action taken by DCFS related to her custody of her daughter. [Exhibit 1, Smith Dep. p. 147].

67. UCMC also has an Equal Employment Opportunity/Affirmative Action/Anti-Harassment and Discrimination policy. The policy contains the following statement regarding Equal Employment Opportunity.

> It is the policy of The University of Chicago Medical Center (UCMC) to recruit, hire, promote, com-pensate, and administer all employment practices and policies without regard to race, color, religion, sex, sexual orientation, marital status, civil union status, national origin, ancestry, age, parental status, disabled status, veteran status, or any other legally protected classification, in accordance with applicable local, state, and federal equal employment opportunity laws. It is UCMC's policy to hire and promote the most qualified applicants and to comply with all applicable law.
>
> This policy governs terms and conditions of employment, including, but not limited to, policies and practices affecting recruitment, recruitment advertising, hiring, promotion, demotion, termination, transfers, reclassifications, selection for training,

16

QB\51866660.1

compensation, benefits, UCMC-sponsored educational and social/recreational programs, and all other aspects of employment. Similarly, UCMC's EEO and anti-harassment and discrimination policies extend to every aspect of the work environment, including abuse of email and all other forms of communication.

The policy contains the following statement regarding Anti-Harassment and Discrimination:

UCMC is committed to providing its employees with a professional work environment free from harassment, discrimination or any unwelcome conduct based on an individual's race, color, sex, religion, national origin, age, disability, marital status,·parental status, sexual orientation, or any other legally protected classification. UCMC has "zero tolerance" for such conduct. This commitment is in keeping with UCMC's Values, its equal employment opportunity policy and practices, and with applicable statutes and regulations. Violations of this Statement will result in corrective action, up to and including termination of employment. Any conduct, whether verbal, physical or visual, that creates a hostile, offensive, or intimidating work environment or that unreasonably interferes with an individual's work environment constitutes harassment under this Statement.

\* \* \*

UCMC prohibits any employee, co-worker, supervisor, manager, outside vendor, consultant, patient or resident, agent, officer, or director of UCMC from harassing any employee or applicant. UCMC views such actions as extremely serious misconduct. It is each employee's responsibility to ensure that these prohibited activities do not occur.

UCMC believes that harassing conduct or language directed at UCMC employees by outside vendors, consultants, patients/residents or their family members, visitors independent contractors, etc. is an affront to UCMC's ethics, values, and practices. As representatives of UCMC, employees should state that harassing conduct or language violates UCMC policies. Similarly, employees are prohibited from engaging in any harassing conduct toward outside vendors, consultants, patients/residents or their family members, visitors, independent contractors, or others.

Any employee who feels that they have been or are being harassed, or have witnessed any conduct that is inconsistent with this Statement, should immediately bring it to the attention of their department head, to Human Resources, or to the UCMC

17

QB\51866660.1

Compliance Resource Line at *1/877-440-5480*. Complaints will be investigated and resolved in a thorough and timely manner. Every effort will be made to ensure confidentiality throughout the complaint/investigation process, consistent with the need to conduct a thorough investigation. After a determination has been made, UCMC will take decisive and appropriate remedial action. Retaliation against anyone who complains in good faith of harassment or discrimination, who provides information relating to such complaints, who otherwise cooperates in any harassment or discrimination investigation, or who otherwise pursues his/her rights under the law is in itself a violation of this policy. Employees who experience or witness any conduct that they believe to be retaliatory are to immediately follow the reported procedures stated above.

[Exhibit 3, Bailey Decl. ¶ 8 and Bailey Exhibit A].

Dated: June 25, 2018                           THE UNIVERSITY OF CHICAGO
MEDICAL CENTER


By: */s/ Jeffrey S. Piell*
One of Its Attorneys


Jeffrey S. Piell, ARDC #6208138
**QUARLES & BRADY LLP**
300 N. LaSalle Street, Suite 4000
Chicago, IL 60654
(312) 715-5000
jeffrey.piell@quarles.com

18

**CERTIFICATE OF SERVICE**

The undersigned, an attorney, hereby certifies that the foregoing was filed electronically using the Court's CM/ECF system on June 25, 2018.  Notice of this filing will also be sent to the following party:

> Belinda Smith
> 2715 West Harrison
> Chicago, IL  60612

by email at belindasmith179@yahoo.com and causing same to be placed in a properly addressed envelope, first class postage prepaid and depositing same in a United States mail depository located at 300 North LaSalle Street, Chicago, Illinois, on this 25th day of June, 2018 before 5:00 p.m.

> /s/ Jeffrey S. Piell
> Jeffrey S. Piell

QB\51866660.1