# EXHIBIT 1

# BELINDA SMITH
# DEPOSITION

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF ILLINOIS

EASTERN DIVISION

**ORIGINAL**

BELINDA SMITH,                          )

        Plaintiff,                    )

           vs.                          )   No. 16 CV 7441

UNIVERSITY OF CHICAGO                    )

MEDICAL CENTERS FOOD SERVICE, )

        Defendant.                    )

DEPOSITION OF BELINDA SMITH

Chicago, Illinois

Wednesday, March 28, 2018

REPORTED BY:  GREG S. WEILAND, CSR, RMR, CRR

JOB NO.        139346

Belinda Smith

A.   I am not.

Q.   All right.  Have you had anything to drink alcohol-wise in the last 24 hours?

A.   No, I have not.

Q.   All right.  Have you taken any non-prescription drugs of any kind in the last 24 hours?

A.   No, I have not.

Q.   All right.  Belinda, do you have any problems with your memory?

A.   No, I do not.

Q.   Good.  While you were employed at the Medical Center, did you take any type of medication?  Let's just talk about the last two years you were at the Medical Center.

Were you on any medicines?

A.   Okay.  So I was terminated in -- on June 26th, 2015, two years --

Q.   So in 2014-2015 --

A.   Two years before 2015, no.  It was -- it will be 2013, two years before, so no, I was not.  But in 2012 I was.

Q.   Okay.  We will talk about that, but I just wanted to clarify.

Belinda Smith

deposition.

So I'm going to mark this as Smith Exhibit Number 1 and ask you to take a look at it.

(Smith Exhibit 1 was marked for identification.)

BY MR. PIELL:

Q.   Have you seen this document before, Belinda?

A.   Have.

Q.   All right.  Do you recognize this to be the Charge of Discrimination that you filed with the EEOC?

A.   Yes, I recognize it.

Q.   And that's your signature on the bottom left of the page, correct?

A.   It is.

Q.   It looks like you signed it on August 6, 2015, correct?

A.   I did.

Q.   Is this the Charge of Discrimination you filed against the Medical Center?

A.   Yes, I did.

Q.   Other than Exhibit Number 1, have you ever filed any other charges of discrimination with the

Belinda Smith

EEOC?

A.    No, I have not.

Q.    And this is the only Charge of Discrimination you've filed against the Medical Center, correct?

A.    Yes.

Q.    Okay.  Now, when this was filed you were represented by a lawyer at the time, correct?

A.    I was.

Q.    And that was Gary Martoccio at the Spielberger firm?

A.    Yes.

Q.    Okay.  Did he prepare this charge or did you prepare it?  Tell me how it was prepared.

A.    I called in, I made a complaint, and his secretary had taken down the information, and yeah.

Q.    Okay.  So Mr. Martoccio's firm submitted this for you?

A.    I'm sorry.  Yes, after -- yes, after they accepted to be a representative, yes.

Q.    Before this was filed, did you review the charge before it was filed?

A.    Before it was filed, did I review the charge before it was filed?

Belinda Smith

Q.   If you can recall.

A.   They really didn't talk to me.  They did not talk to me that much, that often, but yes, I -- let me see.

Q.   It's okay if you don't recall.  You can tell me that you don't recall, so this is not a memory test.

A.   No, I don't remember, no, but -- no, I don't remember.  Let me see.  Okay.  So there were some papers that I did go through, I did have to send back to him, so it was in -- it was after, right after I was terminated.

Oh, right, okay.  So it was the information, the evidence that I sent over to him from UPS, okay.  So then, no, I don't remember.

Q.   That's fine, that's fine.

A.   You said viewed, did I see --

Q.   That's fine.

A.   -- the charge before?

Q.   Let's move on to the next question.

While you have the charge in front of you, do you see that the box for disability is marked off here?

A.   Yes.

Belinda Smith

Q.   And that's the only box that's marked off, correct?

A.   Yes.

Q.   And so your only claim in this charge is one of disability discrimination?

A.   Okay, yeah.  Okay, yeah.  No -- okay.  So may I speak?

Q.   Speak.

A.   May I tell you?  Okay.

So yeah.  So I -- okay.  So yeah, it's a disability.

Q.   Okay.

A.   Disability is checked off.

Q.   All right.  So take a moment and read this to yourself, the Statement of Harm, and tell me if -- we will go over each of these things, but I want you to tell me now if you see anything that's inaccurate in that section.

A.   Okay.  So --

Q.   So, again, my question is, is there anything that's not accurate?

A.   Not accurate, it's -- okay, yes, it's something that's not accurate.

Q.   Okay.  What is not accurate?

Belinda Smith

A.   Yeah, on my own, yes.

Q.   All right.  And so when you prepared this document did you intend it to be accurate and truthful?

A.   Yes.

Q.   And from your perspective is it accurate and truthful?

A.   Let me just look through.

Yes, it is.

Q.   Okay.  So look at Page -- I'm going to direct you to the front near pages 3 and 4.

If you look at the bottom, again there are a number of boxes, and you can turn to the next page and there are more boxes; and I just wanted to confirm that the only claim you've made in the Complaint is one for disability discrimination.

Do you see that?

A.   Yes.

Q.   And then if you continue on down to Question 12, you've checked off the box for the defendant terminated the plaintiff's employment, the defendant failed to promote the plaintiff, the defendant failed to stop harassments; and then in 12(h) you write "retaliation due to personal medical

Belinda Smith

relation.  I was terminated to support the University of Chicago Medical Center's doctors' misdiagnoses.  The diagnosis had caused me to lose custody of my child Jaliya."

Do you see that?

A.    Yes.

Q.    Let's just keep that nearby but put it aside for a moment.

(Smith Exhibit 4 was marked for identification.)

BY MR. PIELL:

Q.    I will now hand you a document that I have marked Smith Exhibit Number 4, which appears to be the Amended Complaint you filed in this case.

Do you recognize Exhibit Number 4?

A.    I do.

Q.    And this is your handwriting on this document, correct?

A.    Yes.

Q.    Did anyone assist you in preparing this amended complaint, or did you do this on your own?

A.    I did this on my own, yes.

Q.    And, again, you intended this Amended Complaint to be accurate and truthful?

Belinda Smith

A. Yes.

Q. And it is accurate and truthful from your perspective?

A. Yes.

Q. Looking again at Pages 3 and 4, you see the numbers at the bottom, and then looking at the boxes at the bottom of 3 and then the top of 4, is it true that you again are only alleging disability discrimination?

A. Yes.

Q. And then if you look down in Question 12, you have marked off the boxes again for 12(b), 12(c) and 12(f), correct?

A. Yes.

Q. And then you wrote another description for (h) by attaching a page. Look at the next page.

Is this page 5 of your Complaint something that you had written and submitted with your Complaint?

Yes? This is your writing?

A. Yeah, yes, it is. But you're saying Page 5?

Q. Yes. You see at the top here it says Page 5 of 13.

Belinda Smith

A.   Okay, yes.

Q.   So that is your writing?

A.   Okay, yes.  I was looking at another page, the Page 5.

Q.   All right.  So we're going to come back and talk about what you've written here in detail, but I just have a couple questions just while we're here.

It says that you were taken off of work on 4/26/2012, or April 26, 2012.

Do you see that?

A.   Yeah.

Q.   So what does that mean?  Did you go off on a leave of absence at that time?

A.   It was -- yeah.  I was having problems, medical problems with the doctors.

Q.   Okay.  But --

A.   And it had -- it was because it was at the same hospital.  That's what I believe, I mean.  This is what -- this is my -- okay.  So I went to the University of Chicago Medical Centers.

Q.   Let me stop you there.  I'm going to ask you all these questions.

All that I want to know right now is how

Belinda Smith

long were you off after April 26, 2012.

A.    Until November.

Q.    2012?

A.    2012, yes.

Q.    And while you were off from April to November were you on suspension?  Were you on a leave of absence?  Were you on short-term disability?  What status were you on?

A.    I was -- I think it was a short-term disability, I think.

Q.    Okay.  So you were receiving some type of payments or benefits from the Medical Center at the time you were off from April to November 2012, correct?

A.    Not -- yeah, yes, but not in the beginning.  It was -- it was an issue.  I didn't receive -- I wasn't receiving money.

Q.    Okay.  At some point you started receiving money?

A.    I did.

Q.    You wrote here, "The food service gave me a financial donation."

What does that mean?

A.    They gave me money.  It was $946.

Page 34

Belinda Smith

Q.    Was this a collection by co-workers?

A.    Co-workers.

Q.    Okay.

A.    And -- yeah.

Q.    And so when you came back to work in November of 2012, do you know who made the decision that you can come back to work?

A.    You got a tissue?

Say what?

Q.    Do you know who made the decision you could come back to work in November of 2012?

A.    No.

Q.    Okay.  It says, continuing on, that in January of 2013 you were moved to the Billings kitchen.

Is that a building, Billings?

A.    Okay.  So -- okay.  So who made the decision?  It was food service management that made the decision for me to come back to work.

Q.    Okay.  Do you know who specifically?

A.    It might have been -- yeah, okay.  So it was -- I think it was Sodexo, yes, and I was moved to Billings, and in January -- it was around January 2013.

Belinda Smith

Q. All right. So just to go back, Sodexo is S-o-d-e-x-h-o? Does that sound right to you?

A. S-o-d-e-x-o, yes.

Q. And that was a third-party provider of food service to the hospital; is that correct? That's a company name?

A. Okay, yes, I think they did provide food. I mean, you know, like it might have been a third party. I don't know.

Q. And Billings, just to clarify, is Billings the name of a building, or is that the name of a location inside a building?

A. It's a location inside the building, yes.

Q. Okay. And did you continue to work at the Billings kitchen for the rest of your employment at the Medical Center after January 2013?

A. Well, can I rewind this? I didn't really know of Billings kitchen. I didn't see it as posted, you know, anywhere, so -- but that's what they were calling it, Billings kitchen.

Q. Okay.

A. So sorry.

Q. Okay. Did we run out already? Okay. At the break I'll get more.

Belinda Smith

Just continuing down here, it says, "In September 2013 I returned from maternity leave."

Did you have a child in September of 2013, or did you mean to write September of 2014?

A. Okay. So I had a stillborn baby. I gave birth to a stillborn baby on August 13th, 2013, and I had returned to work on September the 24th, 2013.

Q. Okay. So you did take a medical leave of absence in August and September of 2013?

A. Yes, maternity leave.

Q. All right. And then continuing on it says, "In September 2014 I gave birth to my daughter."

And that's the birth of Jaliya, correct?

A. Yes. It's September the 18th, 2014, yes.

Q. And if you go to the next page of this Complaint, you make a reference to saying at this point that you were pregnant again.

So were you pregnant in 2016 as well?

A. Yes, yes, I was.

Q. And you gave birth to a son, Greg, at some point in 2016?

A. Yes. Greg Allen Smith was born on November the 8th, 2016.

Belinda Smith

then in 2016 I used the library free of charge, so ...

Q. Okay.

A. I used the library again for 2017.

Q. But you believe you only have a copy of your return for 2017, not the other years?

A. Yes, I do have a copy of 2017 tax returns.

Q. All right. Have you ever filed for disability benefits through the Social Security Administration?

A. No.

Q. Have you filed for unemployment benefits?

A. I have, yes.

Q. Other than unemployment benefits, have you filed any other type of -- for any other type of government benefits?

A. Now for the social security, you mean like -- no, like government, right?

Q. Uh-huh.

A. No work-related, no short-term disability?

Q. No, I'm not asking you about that. I'm asking if you went --

A. No.

Q. -- to the United States Government social

Belinda Smith

security office.

No?

A.    No, no, no, right.

Q.    Do you have any documents that are related to any job search that you've done after being terminated from the Medical Center?

A.    Documents, no.

Q.    Do you have any resumes or applications that you submitted to any potential employers?

A.    I have -- I have a resume, yeah, yeah, and I put it online.

Q.    Okay.  I don't think you've given me that resume, so in addition to the tax returns I'll ask you for the resume, and I'll remind you about that.

Let's switch gears for a moment, Belinda.

What's your date of birth?

A.    October 27, 1982.

Q.    All right.  Are you currently married?

A.    I am not.

Q.    Have you ever been married?

A.    I have not been married.

Q.    Okay.  I've seen in the paperwork that you had a relationship with someone named Robert Carr.

A.    Yes.

Page 87

Belinda Smith

A. The labor and delivery, the doctors, the nurses, the staff. Labor and delivery did not do that. They called DCFS.

Q. All right. Is that what this lawsuit is about, about --

A. It's about my children, my child. I don't care about the employment. It has nothing to do with it. I don't care. It's about my daughter.

Q. So, again, I need to clarify. Are you saying you're not making claims related to your employment?

A. Well, yeah, yes, yes, but it's all -- it's about Jaliya Yvonne Smith. It's what -- yes, it's about her.

Q. That's your main issue?

A. (Nods head.)

Q. Yes?

A. Yes.

Q. Your main dispute with the Medical Center is whatever role it played in you losing custody of Jaliya, correct?

A. Not ever having custody of my daughter, yes.

Q. Okay. Do you know if any of your managers

Belinda Smith

Center has discriminated against you because of disability, and now is your time to state what is the disability that you are claiming you were discriminated against or.

A.    Okay.

Q.    So are you saying you're not disabled?

A.    I would never claim that I'm disabled, no. I would never say that I am disabled because I am not until -- until this happened to me.  And it was very important with the managers who had upper-level positions in the hospital, what they thought about me.

So this is what I mean.  Like one day I was sitting down -- should I tell the story?

Q.    Yes.  I need to know what your disability claim is.

A.    So I was sitting down one day, and it was all three.  All three of the people in a bright room, and I was sitting there with the union rep, and the manager was sitting there with me.  But I don't think he was the union rep at the time, but he said that you better not ever have any children or something like that.  He joked about it.  And he was -- the tone of his voice was like, you know, and

Belinda Smith

things like that.  I don't even know if that was his specific words, but, you know, it was just like I didn't get upset about it or whatever.

Q.   Do you know that man's name?

A.   His name is Byron.

Q.   Byron?

A.   (Nods head.)

Q.   And he was with the union?

A.   No.  He was a management, food service management.

Q.   When did this occur?

A.   Before -- I think I had a stillborn baby, so this is probably afterwards, probably around November or December of something.

Q.   Of '12 or '13?

A.   No, it had to be 2013, so it was -- I was over at Bernard Mitchell.

Q.   So Byron asked you if you had kids?

A.   No, no, he didn't say that.

Q.   So what did he say?

A.   He said I just made a joke about it, like, you know, but it's like all -- it was just a joke. It was supposed to be like a joke.  It was supposed to be like something that never was supposed to be

Page 92

Belinda Smith

heard.

Q. So you testified a few minutes ago that you do not believe that you are disabled or have a disability.

A. I wouldn't say it.

Q. Okay.

A. I wouldn't say that I -- if I -- you know, in 2005, according to my knowledge, I mean, I wouldn't say that I had a disability.

Q. I'm not talking about 2005. I'm talking about 2017. Is that what you meant to say?

A. No, 2005 when I got hired at the University of Chicago Medical Center.

Q. Let's talk about 2014-2015.

Did you have a disability at that time?

A. No.

Q. Let's talk about that time period, 2014-2015.

Did you live on your own at that time or did you live with someone else?

A. I was independent, yes. I lived on my own.

Q. And you were taking care of yourself at that time?

Belinda Smith

A.   Yes.

Q.   You were able to cook and clean for yourself?

A.   Yes.

Q.   How did you get to and from work in 2014 and 2015?

A.   I -- sometimes I walked to work.

Q.   You didn't have a car, did you?

A.   No, I didn't.

Q.   Did you -- outside of work what type of activities were you involved in in 2014 and 2015?

A.   Nothing.

Q.   You didn't go to church?

A.   No.

Q.   Didn't socialize?

A.   No.

Q.   All you did in 2014 and 2015 was work?

A.   I worked.  I went to the grocery store, paid bills.

Q.   Were there any activities that you could not perform in 2014 or 2015 for any medical reason?

A.   No, no.

Q.   So you had no limitations on what you could do at that time?

Belinda Smith

A.   No.  I did have a -- I was off work for pregnancy, so my pregnancy did interfere, and this was in August of 2014.

Q.   But other than the condition related to pregnancy, you had no other limitations on what you could do during 2014 or 2015?

A.   No.

Q.   Were you dating Mr. Carr at the time, 2014-2015?

A.   Yes.

Q.   All right.  All right.  So in the Complaint, which is Exhibit Number 3 -- I'm sorry, Number 4, you write on Page 5 of that Amended Complaint, "In 2011 I had a personal medical procedure that was done and which it ended in being a huge health problem that turned really serious in 2012," okay.

What was the personal medical procedure you had in 2011 which ended up being a huge health problem?

A.   What page did you say it was?

Q.   I'm on Exhibit Number 4.

A.   Exhibit Number 4.  Uh-huh.

Q.   On Page 5, it's your handwritten

Belinda Smith

statement.

A.    Right, okay.

Q.    At the very top you write, "In 2011 I had a personal medical procedure that was done in which it had ended in being a huge health problem."

So what personal medical procedure did you have in 2011?

A.    An abortion.

Q.    Okay.  And what was the huge health problem that resulted?  Is that the insertion of the IUD?

A.    Yes.

Q.    Okay.  And did you have the abortion at University of Chicago or somewhere else?

A.    I did.  It was at the University of Chicago Medical Centers.

Q.    Were you insured by the University of Chicago at the time?  Did you have medical benefits insurance?

A.    I did.

Q.    Okay.  And you had the IUD inserted at the University of Chicago as well?

A.    I did.

Q.    So the huge health problem I think you

Belinda Smith

testified before, is that the interaction between the IUD and the plate that was in your -- that was put in your body?

A.   The medical -- the huge health problem was due to the, yes, the plate, the insertion of the IUD interfering with the surgical plate, yes.

Q.   Okay.  And what were the symptoms that you experienced when the IUD was put that you say was a serious health problem or huge health problem?

A.   It's -- I had -- what is it called?  I had whiplash, whiplash, so I got treated for that at the University of Chicago Medical Centers.

Q.   Is that the huge health problem, the whiplash?

A.   No.  It started that way with the whiplash.  It started at the -- yeah.

Q.   Okay.  So you had whiplash after having the IUD inserted?

A.   Yes.  And then I started having muscle problems with my -- with walking.  It was really bad.  That's when it started.  It started slow.

Q.   Any other symptoms?

A.   It was -- I think it was like sciatic problems.  I was calling it sciatic or something.  I

Belinda Smith

A.    So this was from when -- because it came on slow.  It started -- these symptoms started happening slow, so yeah.  So it didn't happen like right away, so that's what happened.

Q.    In your statement here it says the doctors had called it a mental illness and had sent me to a mental facility.

A.    Yes.

Q.    Which mental facility did you go to?

A.    Lake Shore Hospital.  I went to -- oh, the first one was Mercy Hospital.

Q.    That's not part of the University of Chicago?

A.    No.

Q.    Is Lake Shore a part of the University of Chicago?

A.    I don't know if Mercy is a part of the University of Chicago.  You mean like in their location?

Q.    No.  Just is it part of the University of Chicago hospital system, do you know?

A.    No, no.  Mercy Hospital is different. That's what I --

Q.    You were sent to a mental facility.  How

Belinda Smith

correct?

A.    Right.

Q.    Okay.  And then it says, "I was taken off work on April 26, 2012."  We've talked about that a little bit before.

Do you know who made the decision to take you off work, the name or the title of the person or persons who decided to take you off work?

A.    No, I do not know the people.  I don't know the names.  All I know is that I was focused on my work, you know.  That's it.

Q.    And then you came back to work in November of 2012.

Do you know by name or title who decided that you should come back to work at that time?

A.    I do not.  I do not know.

Q.    What did you do while you were off on leave from April to November of 2012?

A.    Okay.  Hold on because -- okay.  So you said what did I do?

Q.    Yes.  What were you doing?  Were you working?  Were you in the hospital?  Were you getting treatment?  What were you doing for those six months?

Belinda Smith

UCMC?

     A.   No.

     Q.   Let's look at the last page.  Look at the last page of this exhibit, actually the last paragraph.  It says, "Any employee who feels that they have been or are being harassed or witnessed any conduct that is inconsistent with this statement should immediately bring it to the attention of their department head, to Human Resources, or to the UCMC Compliance Resource Line."

          Do you see that?

     A.   Yes.

     Q.   When you were employed at the Medical Center, did you know that there was a compliance resource telephone line to make complaints to?

     A.   I think I did.

     Q.   Did you ever make a call to that compliance line during your employment?

     A.   I don't know, but I think I -- I don't know.  I think someone -- no, I can't remember, no.

     Q.   Did you ever go to human resources to talk about discrimination or harassment at any time during your employment at the Medical Center?

     A.   Human resource, I think I did, yes.

Belinda Smith

Q.    Did you go to speak to anyone else in HR about discrimination or harassment in your last four years of employment?

A.    I'm trying to -- okay, yes, it was this man.  His name was Steve, yeah.  His name was Steve also.

Q.    Do you recall when you went to speak to Steve?

A.    No, no, I don't.  No, I don't think I -- I was just trying to just get my job going.  That's all.

Q.    So you did not go to HR?

A.    I think I noticed it.  It was -- what's -- wow.

Q.    Is it fair to say as you sit here today you do not recall going and speaking to anyone in HR about discrimination or harassment at the Medical Center?  Is that correct?

A.    I think that -- I don't know, but I may be correct.  They lied on me, and I knew that they were lying, so I perfected my work.  I did do that.

Q.    Again, you have no recollection as to whether or not you went to HR to talk about discrimination or harassment; is that correct?

Belinda Smith

A.    They -- no, I don't know.

Q.    You don't know?

A.    No.   It was always the supervisor, but it was -- the HR manager, no, I don't -- it was always the managers, like the supervisor or the -- yeah, or the union rep.

Q.    You would go to your union rep to talk about discrimination or harassment?

A.    Sometimes they would always come to me, like management would make a complaint.  So it was just -- yeah.

                        (Smith Exhibit 10 was marked for
                        identification.)

BY MR. PIELL:

Q.    All right.  I'm handing you a document we will mark as Smith Exhibit Number 10.  Take a look at this and tell me if you're aware of the University of Chicago Medical Center's workplace civility policy.

Were you aware of this policy when you worked at the University of Chicago Medical Center?

Well, since you're reading it, I'll read it with you.  Under the Policy section it states, "University of Chicago Medical Center, UCMC, seeks

Belinda Smith

A. Yes, yes.

Q. All right. Let's put that aside.

So let's talk about your job history at the Medical Center.

You started in food service and you ended in food service, correct?

A. Yes.

Q. So you always worked, while you were at the U of C, you always worked in the food service department in some capacity, correct?

A. Started in food service and -- what do you mean?

Q. Did you ever hold a job at the Medical Center that was not in food service?

A. Oh, no.

Q. Okay. So what was your job at the time you were terminated? You were a food service worker in Billings; is that correct?

A. Yes.

Q. Are there different types of food service workers, like do you have people who are cooks, people who are porters, people who are something else?

A. Yes, okay. So the cashiers, they are --

Belinda Smith

they work with a different business, but they are employees of the University of Chicago Medical Centers, but they work with a different business.

Q. Okay. Were you ever a cashier?

A. No.

Q. All right. So what was the job you held at the time you were terminated?

A. I was supposed to -- I was a -- I was -- goodness. It was 261, a utility, utility --

Q. It was a utility job?

A. -- worker.

Q. And how long did you hold this utility job? Were you in that job for the last year of your employment, last two years, do you recall?

A. For nine months.

Q. For nine months, okay.

So the last nine months at U of C you were a utility worker in the food service department, correct?

A. Not really, because it switched. I made -- I don't know what it's called. I think -- but the position number is 261, 261, and I made stock items like I stocked their pudding. I scooped it up, made pudding. I made food products, so I was

Belinda Smith

like a replenisher for the items they needed on cold prep.

Q.   Who did you report to in that job?  Who was your supervisor?

A.   My manager was Calandria.  I don't know her last name.

Q.   Goshay.

A.   Goshay, okay.

Q.   Who did Calandria Goshay report to?

A.   Marilyn Walls.

Q.   Are you familiar -- you used the term "Sodexo" before.

Are you familiar with the term "Aramark"?

A.   Yes.

Q.   Did Aramark replace Sodexo?

A.   They did, yeah.

Q.   So at the end of your employment Aramark was handling food service at the Medical Center, correct?

A.   Yes.

Q.   Do you know if Marilyn Walls worked for Aramark or for the Medical Center?

A.   She worked for Aramark.

Q.   And did Calandria work for Aramark or the

Belinda Smith

Medical Center?

A.    Calandria worked for Aramark.

Q.    You worked for the Medical Center though, correct?

A.    I worked for the Medical Center.

Q.    You didn't work for Aramark or Sodexo, correct?

A.    I did not work for Aramark or Sodexo, no.

Q.    So in the job you held in the last nine months of your employment, what was your schedule? What days of the week did you work, what hours of the day?

A.    All right.  So I was a full-time worker. I received 80 hours or more.

Q.    80 hours a week, 80 hours a month, what was it?

A.    80 hours a paycheck by week or two weeks, or more; so yes, I got -- I was paid a lot.  I was paid a lot of money -- I mean, not a lot, but I wasn't living in poverty.

Q.    What days of the week did you work, Monday through Friday or weekends too?

A.    Monday and weekends too, Monday and Friday and weekends too.  And the off days were, you know,

Belinda Smith

A.    Yeah.

Q.    So as a food service worker were you a member of a union?

A.    I was.

Q.    You were in the teamsters?

A.    Yeah.

Q.    Local 743?

A.    Yes.

Q.    Are you still a member of that union?

A.    No.  No.

                    (Smith Exhibit 12 was marked for
                    identification.)

BY MR. PIELL:

Q.    I mark this as Exhibit 12.  I'm handing you a document that looks like the application for union membership.

      Do you recognize this document?  Belinda, is that your writing on this document?

A.    Yeah, but I -- beneficiary, what is it? What is this?  Beneficiary?  My mother.

Q.    Do you see that you signed this document on February 10, 2005?

A.    Yeah.

Q.    And, again, this is just an application

Belinda Smith

Q. Why didn't you get a chance to go to that meeting?

A. Because I was visiting my daughter and being I was trying to travel to get to that meeting, and --

Q. So you missed the meeting?

A. Yeah, yes, I did.

Q. You knew about the meeting and were invited to the meeting, correct?

A. I think, yes, I was.

Q. And because you did not go to that meeting you did not file a grievance regarding your termination?

A. I don't know what -- yeah, I don't know what was settled. I don't know what was decided.

Q. Did you ever file a grievance at the Medical Center alleging discrimination or harassment?

A. I think that's when I searched for a lawyer, and he handled that.

Q. Mr. Martoccio?

A. Yeah.

Q. All right. But you don't know if you ever filed a grievance with the union or through the

Belinda Smith

union alleging discrimination or harassment; is that correct?

A. I do not know what happened in that, no. No, I don't know what happened.

Q. Did you ever hold a job in the food services department as a room service attendant?

A. I did.

Q. Okay. Let's go back to Exhibit Number 3, which is the Complaint, probably this big one right here. It is.

Turn to Page 21. You'll see the page numbers again on the top.

Do you see the job there, Position 215C? Did you ever hold that job?

A. Yes.

Q. Look at just quickly the description of that job.

Does that seem to accurately reflect the job that you had?

A. Yes.

Q. And did you have this job in the last nine to twelve months of your employment at the Medical Center?

A. Yes.

Belinda Smith

that story, and --

Q. That happened again in the beginning of 2012 before you went off on leave?

A. That happened after, after I was taken off work.

Q. I see.

A. Or I don't know. I don't know when it happened. It was bad, real bad.

Q. So you gave birth to Jaliya.

Did you ever take Jaliya home?

A. No.

Q. You never had custody of her?

A. No.

Q. All right. And I understand that you went through a parental rights hearing, and I'm sorry to ask you this, but you've lost parental rights for Jaliya; is that correct?

A. Yeah.

Q. Do you know where Jaliya is now?

A. I do not know.

Q. Do you get any visitation with her anymore, or no?

A. No.

Q. When is the last time you got to have

Belinda Smith

managers played any role in any part of the parental rights hearing?

A. Did I --

Q. Looking at your employment supervisors or managers, were they involved at all in your parental rights matter or hearing?

A. Were they involved? Yes, they were.

Q. How were they involved?

A. I don't know. They helped make this a real, real story.

Q. How did your supervisors or managers impact the parental rights hearing?

A. They did not. They did not. But nobody ever even -- nothing was said in my defense, nothing. Nobody ever said anything, and it was just what they had, what they wanted or what they said, and it was actually taken against me. And I had to find out at -- you know, it was just something that really got out of -- yeah, it's no patrol over it.

Q. Is Jaliya's father Mr. Carr?

A. Yes.

Q. Is he also the father of Greg?

A. Yes.

Q. And what hospital was Greg born in?

Belinda Smith

Q.   Okay.  In 2014 did you take any leaves of absence other than the time off you took after Jaliya's birth?

A.   In 2 --

Q.   '14.

A.   '14, did I do what?

Q.   Did you take any leaves of absence from the Medical Center in your job?

A.   I was suspended for one month.

Q.   All right.  That's different from a leave.

Did you take any -- how much time did you take off after Jaliya was born?

A.   One month -- wait.  I returned November the 3rd.  I think it was November the 3rd or the 4th --

Q.   So --

A.   -- of 2015.

Q.   '14?

A.   '14, I'm sorry, 2014, I'm sorry.

Q.   So other than the time you took off after Jaliya's birth, did you take off any other work for any medical conditions or anything like that --

A.   No.

Q.   -- in 2014?

Belinda Smith

A.    No.

Q.    Did you take any time off in 2015 for any medical conditions of any kind?

A.    I'm sorry.

Q.    We're going to take break in just a minute.

A.    Okay.  So what did you ask?

Q.    In 2015 did you take any leaves of absence for any medical conditions?

A.    No.

Q.    Do you recall whether you took any sick days off in 2015?

A.    No.  I don't call off.

Q.    In 2014 did you take any sick days other than the time you took off for pregnancy?

A.    No sick days, no.

MR. PIELL:  Okay.  Why don't we go off the record.

                    (Whereupon, a lunch recess was
                    taken from 12:38 p.m. to
                    1:14 p.m.)

BY MR. PIELL:

Q.    Let's go back on the record.

All right.  Ms. Smith, we're back from a

Belinda Smith

A.   I'll need a minute.  Hold on, please.

All right.

Q.   All right.  Do you recall receiving this document and refusing to sign it?

A.   Not this specific document, but okay, yeah, I -- yes.

Q.   At the top there it identifies the manager as Amy G-r-z-y-b.

Do you know how to pronounce that name, Amy Grzyb?

A.   Grzyb, okay.

Q.   Do you know her last name?

A.   I do not know her last name.

Q.   Do you recall having a supervisor named Amy?

A.   Yes, I do.  I remember her.

Q.   Was she Aramark or Sodexo?

A.   She was Aramark -- Sodexo, sorry.

Q.   Do you recall when the turnover was from Aramark to Sodexo?  Was that 2014?

A.   2014, yes, I was pregnant, and I think the month was June.

Q.   So looking at this corrective action, you'll see the box for Documented Verbal Warning is

Belinda Smith

A.   I think so, yes, he did.

Q.   And I think you said before that you left it to the union, but you don't recall whether you asked to grieve this discipline, correct?

A.   Right.

Q.   And did you understand what a written warning was back in 2013?

A.   Yeah, they would explain it like if you -- it's not good to have them.

Q.   Right.  And did you understand from this section of the written warning under Description of Reasons that any continued infractions will progress corrective action up to and including termination? Did you understand that after you got your written warning that the next time you got discipline it could be a greater discipline than a written warning?

A.   Yeah, I think, yeah.

Q.   As you sit here today, do you have any information or evidence that Donna Anderson or Jeffrey did not believe what they had written in this corrective action at the time they gave it to you?

A.   Did they believe?

Page 177

Belinda Smith

so it was -- it wasn't complicated work.

Q.   Belinda, if it's your testimony that this is a lie, why is it that you did not write a rebuttal or grieve the corrective action?

A.   I don't -- I don't -- I didn't see this.

Q.   So it's your testimony you never received this Exhibit Number 18?

A.   No, this, no, not this.

Q.   Is it possible you saw it and you don't recall it?

Belinda?

A.   Yes.

Q.   Is it possible you received it and you just don't recall it as you sit here today?

A.   No, no.  I haven't -- I didn't receive a letter like this.  It wasn't -- no.

(Smith Exhibit 19 was marked for identification.)

BY MR. PIELL:

Q.   I'll hand you a document we've marked as Exhibit Number 19.  It's a corrective action form, date of issue July 30, 2014, to you.

Do you recall receiving this corrective action, Belinda?

Belinda Smith

A.    I think so, yeah.

Q.    And you see that this is marked as a final written warning.

Do you see that?

A.    Yes.

Q.    Do you understand what a final written warning is?

A.    Yes.

Q.    All right.  Do you recall whether or not you signed this document?  I don't see your signature there, so ...

A.    But it's initials.  I don't think I put my initials there.  I don't know.

Q.    So it's possible -- is it possible you wrote your initials there?

A.    It reads employee --

Q.    Initials, yes.

A.    -- initials, and then it has BS.

Q.    Does that look like your writing?

A.    It -- my signature changes sometimes, so no.  But I don't think -- I don't know if it was.

Q.    Let's look at this corrective action for which you received a final written warning.  The reasons are unsatisfactory work performance and

Page 179

Belinda Smith

failure to comply with pride values, care standards, workplace civility policies.

Do you recall, do you recall those were the reasons for the corrective action?  Don't go ahead.  Just follow me on the document.

A.    Okay.

Q.    Do you recall that unsatisfactory work performance and failure to comply with pride values, care standards and workplace civility was the reason for this final written warning?

A.    In -- unsatisfactory work performance, yeah, that's what they complained about.

Q.    And the signature of the supervisor is Marilyn Walls, correct?

A.    Yes.

Q.    Do you know who that other signature is?

A.    I don't know.

Q.    All right.  Now --

A.    I don't know.

Q.    There's a writeup on the second page of this Exhibit Number 19 which says at the top, "Belinda is being issued a final written warning for unsatisfactory work performance and violating the Medical Center's service pride and civility

Belinda Smith

policies." And then there are four paragraphs with examples of performance issues.

But I want to first focus on the last paragraph, which says, "Previously Belinda has received a verbal warning, written warning and suspended for unsatisfactory work performance. Belinda's continued failed [sic] to perform her assigned job duties satisfactorily will result in further corrective action up to and including termination of her employment."

Do you see that?

A. Yes.

Q. Did you understand at the time you received this final written warning that any future failure to perform could lead to your termination?

A. One of those dates was wrong, but yes, I did understand that. I was in -- I was in there for -- yeah.

Q. Did you file a rebuttal to this corrective action, submit anything in writing in response?

A. No. I wasn't here on those days. I wasn't at work.

Q. Your testimony is that you were not at work on June -- what days?

Belinda Smith

A. No, I think it may have been in May, in May.

Q. So you believe you were suspended in May of 2014?

A. Yeah, it may have been.

Q. Do you know why you were suspended in May of 2014?

A. It was the same thing about --

Q. Performance issues?

A. I think so, yes.

Q. Did you file a grievance related to that suspension?

A. No.

Q. Okay. Do you recall meeting with Marilyn Walls to discuss this final written warning, Exhibit Number 19?

A. No.

Q. You don't recall?

A. I don't -- yeah, so I don't remember. But I remember this -- I remember seeing the dates, and it was a day that I wasn't -- it was a day that I wasn't there.

Q. So you believe that the lie that you're describing is the date that's written in this

Belinda Smith

document?

A.    Yes.

Q.    Do you have any evidence or information as you sit here today that Marilyn Walls did not believe the information that was written in this Exhibit Number 19?

A.    No.  But I did communicate that to someone.

Q.    Who did you communicate that to?

A.    It was someone in the behavioral center. I think it was Bobby E. Wright.

Q.    So you communicated that to your caregivers, correct?

A.    Yeah.

Q.    Not to someone at the Medical Center?

A.    No.  I had my paper -- yeah.

Q.    I think you testified earlier that you did not go to human resources or HR about any of your disciplinary issues; is that correct?

A.    I think -- I don't know.

Q.    And your testimony before is you did not call the compliance line about any of the disciplinary issues that you experienced at the Medical Center; is that correct?

Belinda Smith

A.   I was there.  I'm trying to remember like -- I'm trying to read all of this.  Okay.

What?  Wait, wait, wait, wait, wait.

Okay.

Q.   My question again, Belinda, you were talking about a meeting in which Calandria and Marilyn and a union representative and yourself were present.

A.   Okay, yeah.

Q.   Do you recall anything you said during that meeting?

A.   No, no, I don't.

Q.   Do you recall what the union representative said at that meeting?

A.   No.

Q.   Do you recall anything that Marilyn or Calandria said at that meeting?

A.   No.

Q.   Do you have any reason -- I'm sorry.

Do you have any information or evidence that Marilyn Walls did not believe the information that was written in this corrective action, which is Exhibit 20?

A.   No.

Belinda Smith

Q.   Do you have any evidence or information that Calandria Goshay did not believe the information contained in Exhibit Number 20?

A.   Yes.  Wait a minute.  Yes.

Q.   What information or evidence do you have --

A.   Oh, no.  I don't have any information or -- information, yeah.  She was there, and she -- okay.

Q.   What information or evidence does Calandria Goshay -- I'm sorry, strike that.

What evidence do you have that Calandria Goshay did not believe the information written in this corrective action?

A.   I have -- I don't have any.

Q.   Okay.  Turn to the third page of this document, please.

Do you recognize this document?

A.   I think so, yeah.

Q.   Is that your signature at the bottom?

A.   Yes, it is.

Q.   It looks like you signed it on March 20, 2015?

A.   Yes.

Belinda Smith

Q. And is this a time activity schedule for job position 215B?

A. Okay. Yes.

Q. Is this a job that you held as of March 20, 2015?

A. Yes.

Q. All right. So this set out your tasks and the standard of performance, correct?

A. Yes.

Q. And you understood when you signed this what your assignment, your tasks were and what the standards of performance were, correct?

A. Yeah, yes.

Q. And you received this final written warning.

Did you understand that if you had subsequent performance issues that it could lead to your termination?

A. Yes, I did.

Q. All right. So you can put that aside.

Do you recall incidences where you had disagreements with Calandria?

A. Disagreements with Calandria, yes.

Q. Do you remember any situations or

Belinda Smith

Can you recall any instances where you raised your voice at her?

A.    I used to argue with them, and then they said that my -- that I was yelling, and so that's --

Q.    On how many different occasions did you raise your voice with Calandria?

A.    I don't remember.  If she -- I didn't, you know, I was -- I didn't mean to raise my -- you know, yell at her.

Q.    Would you say it's more than five times you raised your voice or yelled at Calandria?

A.    I used to argue a lot with them.  I argued with a lot of them.

So and then Calandria, she -- if she thought that I was yelling at her, then I might have been yelling.  But I was yelling for -- I mean, it was a good reason.  I didn't curse at her or anything like that.

Q.    Okay.  Look at the entry for February 4th. On February 4, 2015, Belinda was escorted out of the kitchen because she was yelling at Calandria Goshay.

Do you recall that?  Do you recall being escorted out of the kitchen after yelling at Calandria?

Page 197

Belinda Smith

A.    And they just -- oh, my gosh.  They just -- I mean, they just --

Q.    Do you recall snatching a mop?

A.    Yes, yes, I did, I did.

Q.    All right.  Did you also stop Shelvon Johnson on her way to deliver carts so you could redo the soup because you said they didn't do it right the first time?  I'm sorry I read that very poorly.

Do you recall stopping Shelvon Johnson on her way to deliver carts so that you could reheat soup?  Do you recall that incident?

A.    It may have been me.  I don't know.

Q.    Did you ever tell Calandria that God was going to get her?

A.    Oh, wow.  I don't even know that.

Q.    Is it possible you said that to her?

A.    No.  I -- oh, wow.  No.

Q.    Do you recall one way or the other as you sit here today whether or not you told Calandria that God is going to get her?

A.    Probably -- I don't know because it's like now it's just after all of this that I've learned.  Oh, my goodness.  I don't -- I don't know.

Belinda Smith

A.  Right.  I don't know.

Q.  Did you ever threaten to fight a co-worker?

A.  No, no, never.

Q.  Did you ever suggest to someone that you would fight them?

A.  No.

Q.  Do you recall telling employees I'll fight people in here today?

A.  Oh, okay, say -- say a fight, okay, okay. Okay.  No.  I used that word "fight" meaning that I would argue with them, not physically fight, and they knew that.

Q.  But you did say in the workplace that you'd fight with people, right?

A.  I think I did, yeah.  That sounds like I said that.

Q.  So when you met -- do you recall you had a meeting with Calandria, Marilyn and your union representative about this corrective action in March 2015?

Do you recall being able to speak at that meeting?  Did you get to speak at the meeting?

A.  What, this meeting?

Belinda Smith

co-workers that your workload was lighter than theirs?

A.    The work?

Q.    That your workload was lighter than other employee's workloads.

A.    Oh, no, never.  I did a lot of work. Sorry.

Q.    You said you were suspended on June 5th, 2016 -- 2015, correct?

A.    June 5th, 2016 -- '15, yes.

Q.    Do you recall why you were suspended at that time?

A.    That was because of the threat that someone had witnessed, yeah.

Q.    They witnessed you talking about fighting with other employees?

A.    Fighting with a manager or something and threatening a manager.

Q.    Okay.  And did you ever return to work after that, or were you terminated at the end of that suspension?

A.    I was terminated.

Q.    All right.  How did you learn of your termination?

Page 208

Belinda Smith

A.   No.   They came and met me when I was on the street; and then I phoned a co-worker, and it was a current co-worker who works there still.   I don't -- I don't know his name.   And it was also Jasmine Gregory.   She's the union steward.

Q.   Okay.   So someone came to see you on the street.

They told you or they came to talk to you about your termination, correct?

A.   Yes.

Q.   Did anyone from the union provide you your termination letter?

A.   No.

Q.   And I think you testified before lunch that there was a meeting with the union and the company in the hospital to talk about your grievance that you did not go to because you were on a visit with your daughter, correct?

A.   Yes, yes.

Q.   Did you make any efforts with the union to reschedule that meeting to discuss your grievance?

A.   No.

Q.   Okay.   Did you appeal your termination in any way?

Belinda Smith

A.    Appeal it, no.

Q.    Did the union -- after you were unable to make that meeting because you were visiting with your daughter, did the union reach out to you again to try to meet with you and the hospital?

A.    Did the union try to meet --

Q.    Yes.  Did the union try to reach you again, say let's go talk to the Medical Center, or did you just lose touch with the union at that point?

A.    I just -- I received -- okay, yeah, so I received another message when I was on the -- they were saying that my -- yeah.  So no, no, it wasn't, no.

Q.    So no, the union did not contact you again?

A.    No.

Q.    That's correct?

A.    I was just hearing -- it was just -- it was just people just -- no, I didn't.

Q.    Did you ever go back to the Medical Center, you know, physically after you were terminated?

A.    Yes, I have.

Belinda Smith

So let's talk back about your claims again that you're making here against the Medical Center.

Did you ever tell anyone in food services that you were disabled or had a disability?

A.   No.

Q.   Did you ever tell Marilyn Walls that you were disabled or had a disability?

A.   No.

Q.   Did you ever tell Calandria Goshay that you were disabled or had a disability?

A.   No.

Q.   Did you ever tell any of the supervisors that worked for Sodexo, whether Amy or Donna, that you were disabled or had a disability?

A.   No, no.

Q.   Did you ever --

A.   Not verbally, no.

Q.   Did you ever tell HR that you were disabled or had a disability?

A.   No.

Q.   Did you ever call the compliance line to say you were disabled or had a disability?

A.   No.

Q.   Did you ever inform anyone at the

Belinda Smith

University of Chicago Medical Center that you were disabled or had a disability?

A.     No.

Q.     Did you ever seek any type of accommodation or job modification at the Medical Center because of any physical or mental condition you had?

A.     Did I ever receive --

Q.     Did you ever ask for any type of job accommodation or job modification at the Medical Center based on any physical or mental condition that you had?

A.     Okay.  So no, I didn't want to -- I just -- I didn't want to cause any problems.  I just tried to come to work and do my job.

Q.     Okay.  Did you have any discussions with any of your co-workers in the food services department about any disability or disabling conditions you had?

A.     Discussed with my co-workers about my disability?  I talked to them about my problem when I had my Mirena IUD and I had a surgical plate in my head.

Q.     You told co-workers about the IUD and the

Page 214

Belinda Smith

did tell him that.

Q.    Do you know if Antonio discussed that with any of your managers or supervisors in food services?

A.    No.

Q.    Who else in food services did you discuss either the plate or the IUD?

A.    I discussed the IUD with the female co-workers.  I don't know their names.

Q.    And do you know if any of those female co-workers discussed your IUD with your supervisors or managers?

A.    No.

Q.    Did you ever ask for FMLA leave while you worked at the Medical Center, family medical leave?

A.    I might have, yes.

Q.    Do you recall when?

A.    FMLA, oh, when you call off, okay.  No, no.

Q.    Did you ever bring any medical documentation to your supervisors or managers in the food services department?

A.    Any medical documentation?

Q.    Right, any document from your doctors,

Belinda Smith

documentation to HR at any time?

A.    Might have had to.  I don't remember.

Q.    You don't know?

A.    I don't know.

Q.    Did you ever have any of your doctors contact any of your managers or supervisors at the Medical Center?

A.    No, I don't remember.  No, no, I didn't.

Q.    Did Calandria ever say anything to you that you felt was discriminatory based on disability?

A.    Oh.  Yeah, she -- no, no.

Q.    Did Marilyn Walls ever say anything that you believed to be discriminatory based on disability?

A.    No.

Q.    Did any supervisor or manager in food services make any statements that you believe to be discriminatory based on disability?

A.    I'm trying to -- that's Calandria, she -- okay, so ...

No.

Q.    No?

A.    No.

Belinda Smith

Q. In your last --

A. Oh.

Q. Go ahead.

A. Ask it again. Is discriminatory?

Q. I said did any other supervisors or managers make any statements that you considered to be discriminatory on the basis of a disability?

A. Yeah, it was one, one woman; her name was Nadine. She said that I was -- she told everyone that there's something weird about her. She wanted people to treat me in a certain way.

Q. Who was Nadine?

A. Nadine was -- I don't know her last name, but she's from Canada. She was a food service worker at University of Chicago Medical Centers.

Q. She was a service worker like you?

A. No, she was a manager. And I had walked -- I walked in and I confronted her, and she was just looking like she was sad. I didn't want her to feel like really bad about it, so, you know, I just told her what I said, and I don't remember what -- oh, goodness. I don't remember what I said.

Q. You don't recall what you said to Nadine?

A. (Shakes head.)

Belinda Smith

Q. No? You've got to verbalize your answer.

A. No. At this moment I do not remember.

Q. When did Nadine make the statements that there's something weird about you?

A. I think it was like the end of November of 2012.

Q. This is when you had just come back from leave?

A. Yeah.

Q. Did Nadine work for Sodexo?

A. I think so, yes, she did.

Q. When you said Nadine told everyone that there's something weird about you, were you there at the time?

A. I was there. I was -- I was outside the door, and I listened to what she had said. Then I walked in, and I don't remember what I said to her. I probably said, you know -- I don't know. She looked like -- she looked embarrassed.

Q. Did Nadine ever say anything else that you felt was discriminatory?

A. No, she didn't. I don't think she said anything else, just like, no, she didn't.

Q. Did Nadine take any action against you

Belinda Smith

that you believe was discriminatory?

A.    No.  She just -- no.

Q.    Other than the one comment by Nadine, did any other supervisor or manager or fellow co-worker make any comments to you or in your presence that you believe to be discriminatory based on a disability?

A.    It was not in my presence, no.  They didn't know that I was around at the time.  I had another manager say -- let her know if there is -- if there is any abnormal behavior or something like that.

Q.    You've got to speak up.

Who made that statement?

A.    So it was -- so a manager; her name is Amy.  And she had said that to I think it was Nadine and Kaitlyn at the time.  She told her to let her know if Belinda exhibits any abnormal behavior, and I don't remember those as specific words, but yeah.

Q.    When did Amy make this statement?

A.    I think this was in November 2012.

Q.    All right.  So at or about the same time Nadine made her statement, right?

A.    Yes, to a lot of co-workers.

Page 220

Belinda Smith

Q. Okay. So you overheard Amy make this statement?

A. Amy told the managers, yes.

Q. Where was Amy and where were you at the time this statement was made?

A. Amy was in the manager's office talking.

Q. And where were you?

A. I was outside listening. I was listening by the door.

Q. Okay. Has Amy taken any action against you that you believe is discriminatory based on a disability?

A. No.

Q. Other than the statements by Nadine and Amy, did anybody else at the Medical Center, either your supervisors, managers or co-workers, say anything that you believe was discriminatory based on a disability?

A. No, no.

Q. So you've now testified to all of the statements that you're aware of related to the disability, correct?

A. I don't know what they said when I was not there, but I know what a manager had said jokingly

Belinda Smith

about you better not have any children or something like that.

Q.    Who said that?

A.    Byron.

Q.    And what exactly do you recall him saying?

A.    He said you better not have any children or something like that, he said, and, you know, and Gloria was right there.

Q.    When did Byron make this statement?

A.    This probably was in 2013. I don't know, 2 -- yeah, probably around --

Q.    Byron was a supervisor?

A.    A manager, yeah.

Q.    Was he with Sodexo?

A.    Yes. So it was around --

Q.    Did he remain with the Medical Center after Sodexo left, or did he leave with Sodexo?

A.    I think he left when -- he left when Aramark had taken over, yes.

Q.    Did Amy also leave when Aramark took over?

A.    No, she didn't leave. She left before; she left before.

Q.    Did Byron take any actions against you that you believe to be discriminatory?

Belinda Smith

A.   I don't know.  No.

Q.   Okay.  Any other statements that anybody made to you that you believe to be discriminatory based on disability?

A.   No.

Q.   Okay.

A.   I ...

Q.   You have alleged in the charge, "In 2014 I was baselessly suspended twice because I was told I could not complete my work."

So we've talked about those two suspensions, correct?

A.   Yes.

Q.   And you believe there's a third suspension as well, correct?

A.   There may have been, yes.

Q.   You continue in the charge by saying, "The reprimands were issued shortly after initiating a discrimination complaint internally and with my union representative."

What discrimination complaint did you initiate internally?

A.   What do you mean?  What discrimination?

Q.   Didn't you complain about discrimination

Belinda Smith

record and take a short break.  I think we could all stand up for a minute.

So let's take five minutes and come back at 3:00 o'clock.

(Whereupon, a recess was taken from 2:52 p.m. to 3:00 p.m.)

MR. PIELL:  All right.  Let's go back on the record.

BY MR. PIELL:

Q.  All right.  Belinda, continuing on, do you believe that Calandria Goshay took any action against you based on any disability?

A.  No, I don't think so.

Q.  Do you believe Marilyn Walls took any action against you because of a disability?

A.  No.

Q.  And to be clear, any disability that you had -- strike that.  Let me start this again.

Did Calandria Goshay discriminate against you in any way?

Belinda?

A.  I'm trying to understand.  I can't --

Q.  Well, let me put it in context.  In your charge and in your lawsuit you claimed disability

Belinda Smith

Anything?

A.   I'm trying to remember any abnormal, any abnormal work.  This feels terrible.

Q.   Belinda, do you have any evidence that Calandria Goshay took any action against you because of a disability?

A.   No.

Q.   Do you have any information or evidence that Calandria considered you to be disabled?

A.   I don't have any evidence for it, but I was trying to remember.

Q.   Do you have any information or evidence that Marilyn Walls took any action against you because of a disability?

A.   No.

Q.   Do you have any information or evidence that Marilyn Walls considered you to be disabled?

A.   Okay.  So no, but they would -- they would terminate me -- I mean, they would like suspend me for -- no, I don't have any.

Q.   Do you have any evidence or information that your termination or any of your suspensions were based on disability or a belief that you were disabled?

Belinda Smith

manager at the Medical Center that took any action against you because of your disability or a belief that you were disabled?

A.    No.

Q.    In the Complaint you allege that the Medical Center failed to promote you.

Is that a claim that you're making?

A.    Okay, yeah, all right.

Q.    What promotion or promotions did you seek that you did not receive?

A.    Someone had got a set schedule, and they had less seniority than I had.

Q.    And that's the complaint you made in 2007 you said?

A.    No, that was -- that complaint was the grade 8 workers, grade 8 workers, grade and then the number 8.  There were -- it pays, a little more money than the ones who work at the grade 7.

Q.    So you were a grade 7?

A.    I was grade 7.

Q.    And just to be clear, what complaint did you make in 2007?  Was it about the grade 8 or about getting a set schedule?

A.    It was about grade 8.

Belinda Smith

area.  I don't know because I didn't read what it was.

Q.  Okay.  So I think you missed my question.

My question was, do you have any information or evidence that Cedric got that position because of your disability or a belief that you were disabled?

A.  Oh, no, no.

Q.  Okay.  Any other promotions that you believe that you had been denied?

A.  No.

Q.  Other than what you've testified to here today, have you made any other complaints of discrimination or harassment to any member of management at the Medical Center?

A.  Could you ask the question?

(Question read.)

THE WITNESS:  Other than what I discussed, what we discussed today?

BY MR. PIELL:

Q.  Correct.

A.  Have I made any other complaints to management?

Q.  Yes, about discrimination or harassment

Belinda Smith

A. -- please, because this is a huge, real serious case.

Go ahead.

Q. What evidence or information do you have, if any, that Marilyn Walls had any knowledge about any diagnosis given to you by a Medical Center doctor?

A. What -- okay. So no, no, they have not. It was -- there was -- you mean like a doctor would communicate my information to --

Q. To Marilyn.

A. To Marilyn, no, no.

Q. You have no information that Marilyn knew what any doctor diagnosed you; is that correct?

A. Right, no.

Q. And similarly, you've got no knowledge or information that Calandria Goshay knew any diagnosis that a Medical Center doctor had given you, correct?

A. Right, that's true.

Q. And you have no information or evidence that any member of your management knew what a Medical Center doctor diagnosed you with at any time, correct?

A. That's not true.

Belinda Smith

environmental services, also; and they were walking down the hallways hollering or whatever. They were disability.

Q.   Do you believe that either of those women were treated differently from you at the workplace?

A.   They were told not to come next to me or don't talk to me or whatever.

Q.   Who told them that?

A.   I recollect, but it's something -- you know what, I don't have any proof.

Q.   Okay.  Are you aware of anyone else who had any disabilities in the food service department?

A.   No, it was just those people.  Right, I don't -- you know ...

Q.   Are you aware of any employees in food services who were insubordinate or argumentative at work and were not disciplined in any way?

A.   I didn't try to -- I didn't try to -- I didn't try to know anyone else's personal information, like personal business.

Q.   Do you know if any other food service workers were written up, given written warnings?

A.   I think they did discuss that.  I don't know.

Belinda Smith

Q.   Do you believe that there are any other workers in the food service department that were treated differently from you because they did not have a disability or were not considered to be disabled, or disability had nothing to do with it?

A.   I don't know because I didn't -- I just responded.  That's all I did.  I didn't worry about anyone else.  I responded.

Q.   You minded your own business?

A.   Yes.  I did what I had to do.

Q.   Other than the testimony we've already talked about, the retaliation to defend the Medical Center doctors, do you allege that you experienced any other retaliation at the Medical Center in terms of employment?

A.   Any other discrimination?

Q.   No, retaliation.

A.   Retaliation?

Q.   Yes.  Well, let me put it this way:  Do you believe that Marilyn Walls retaliated against you in any way?

A.   I don't know.

Q.   You have to speak up.

     You testified I don't know.  Is there

Page 273

Belinda Smith

anything else?

A. You said what now?

Q. You answered my question about Marilyn Walls by saying "I don't know."

A. I don't know. I don't know. It may -- see, she was just probably doing her job, and it was to be -- unfortunately it was just that kind of incident.

Q. Do you claim that Calandria Goshay retaliated against you?

A. Retaliate. Retaliate, I don't -- I don't know what that would mean.

Q. Do you not know what the word "retaliate" means, or you just don't know what that would mean in terms of Calandria?

A. To try to get revenge or something?

Q. That's one definition of it.

A. I can't -- I can't truly say that.

Q. Did any other member of management at the Medical Center take any action to retaliate against you in 2014 or 2015?

A. Okay. So retaliate. Could you ask that question again?

Q. Sure. Do you claim that any member of